UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
YOLANDA SANTIAGO-JIMENEZ,　　　　　　:　15 Civ. 3884 (GBD) (JCF)
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Plaintiff,　　　　　:　　　　REPORT AND
　　　　　　　　　　　　　　　　　　　:　　　RECOMMENDATION
　　- against -　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
COMMISSIONER OF SOCIAL SECURITY,　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Defendant.　　　　　:
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 3/16/16

　　　　The plaintiff, Yolanda Santiago-Jimenez, brings this action

pursuant to section 205(g) of the Social Security Act (the "Act"),

42 U.S.C. § 405(g), seeking review of a determination of the

Commissioner of Social Security (the "Commissioner") finding that

she is not entitled to Supplemental Security Income ("SSI")

benefits.[*]   The parties have submitted cross-motions for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure.  For the reasons that follow, I recommend denying

the Commissioner's motion, granting the plaintiff's motion, and

remanding the case to the Commissioner to consider new, material

evidence.

---

[*] At one point in her submission, the plaintiff asserts that
she applied for both SSI and Social Security Disability Insurance
benefits.  (Plaintiff's Memorandum of Law in Support of Her Cross-
Motion for Judgment on the Pleadings ("Pl. Memo.") at 1).  I assume
this is merely an error, as later she states, as did the
Administrative Law Judge ("ALJ") adjudicating her claim, that she
applied only for SSI.  (Pl. Memo. at 15; Administrative Record
("R.") at 45).

Background

    A.  Personal and Vocational History

    Ms. Santiago,[2] who was born on September 6, 1965, filed an application for SSI on May 31, 2012, when she was 46 years old. (R. at 90). She has an eleventh grade education, and reported that, within the 15 years prior to her claimed disability date, she had worked as a clerk for a staffing service from 1998 until mid-2003. (R. at 171). She stopped working on June 1, 2003, due to depression, anxiety and panic attacks, asthma, anemia, and pain in her lower back, leg, knee, and left hand.[3] (R. at 166, 170). There is conflicting evidence as to whether she is able to communicate in English. She reported on an undated disability report form that she could speak, understand, read, and write English, appears to have filled out a function report questionnaire in English in July 2012, and reported that she could speak, read and write English in April 2013 (R. at 169, 180-92, 394); however,

    [2] I will follow the plaintiff's practice and refer to her as Ms. Santiago. (Pl. Memo. at 1).

    [3] Although Ms. Santiago alleges a disability onset date in June 2003, SSI benefits "can only be granted prospectively"; therefore "the only issue [to be decided is] whether [Ms. Santiago] was disabled under the Act as of . . . the date of [her] application." Dehnert v. Astrue, No. 07 CV 897, 2009 WL 2762168, at *4 (N.D.N.Y Aug. 24, 2009) (collecting cases); 20 C.F.R. § 416.335. However, the ALJ is required to develop a "complete medical history," which includes at least the twelve months preceding the filing of an application. Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (quoting 42 U.S.C. § 423(d)(5)(B)). In addition, evidence post-dating the ALJ's decision must be considered by the Appeals Council if it "relates to the period on or before the date of the ALJ's decision." Hawn v. Commissioner of Social Security, No. 5:14 CV 1387, 2016 WL 481065, at *16 (N.D.N.Y. Feb. 5, 2016); see also 20 C.F.R. § 416.1470(b).

after she testified before the ALJ through an interpreter, the ALJ in his decision determined that she cannot communicate in English (R. at 54, 72).

B. Medical History

1. Prior to May 31, 2012

Svetlana Tokar, D.O., referred Ms. Santiago for an x-ray, which was performed on August 16, 2007. (R. at 292). Sasikala Mohan, M.D., found "[m]ild degenerative changes of the apophyseal joints of L4 and L5,"[4] but no radiopaque calcification or obstruction, and no evidence of spondylolysis or spondylolithesis.[5] (R. at 292). An MRI of the lumbar spine performed on February 8, 2008, found "degenerative changes of the lumbar spine with slight bulging disc," but no disc herniation or intradural lesion. (R. at 291). A foot x-ray on August 18, 2011, found no acute fracture, mild acute soft tissue swelling, and "small bilateral plantar calcaneal spurs."[6] (R. at 303).

---

[4] "An apophyseal joint is a point where two or more bones join in the spine." Apophyseal Joint Definition, www.spine-health.com/glossary/apophyseal-joint (last visited March 3, 2016).

[5] "Spondylolysis is a condition in which the there is a defect in a portion of the spine called the pars interarticularis (a small segment of bone joining the facet joints in the back of the spine). With the condition of spondylolisthesis, the pars interarticularis defect can be on one side of the spine only (unilateral) or both sides (bilateral)." Thomas E. Hyde, Spondylolysis and Spondylolisthesis, http://www.spine-health.com/conditions/spondylolisthesis/spondylolysis-and-spondylolisthesis (last visited March 3, 2016).

[6] Calcaneal spurs, commonly known as heel spurs, are bony spurs projecting from the back or underside of the calcaneus, or heel bone. Calcaneal spur, http://www.medicinenet.com/script/main/art.asp?articlekey=7095 (last visited March 3, 2016).

Ms. Santiago visited Dr. Tokar on February 15, 2012, complaining of knee pain. (R. at 325). Dr. Tokar diagnosed, among other things, knee pain and depressive disorder not otherwise specified, referred her to a PMR specialist,[7] and continued her Zoloft prescription for depression. (R. at 325). The next day, the plaintiff visited Binod Shah, M.D., presumably pursuant to Dr. Tokar's referral. (R. at 323). She complained of constant sharp, stabbing, throbbing left knee pain at an intensity of seven on a scale of ten, which was aggravated by climbing or descending stairs, standing, and walking; and low back pain radiating down her lower extremities with both numbness and tingling. (R. at 323). An examination in connection with her knee problems showed peripatellar and medial joint line tenderness and significant guarding, but normal alignment and no effusion or erythema.[8] (R. at 323). An examination of the lower back found severe paraspinal tenderness. (R. at 323). Straight leg raising test was positive at 45 degrees with hamstring tightness, and facet-loading test was positive bilaterally. (R. at 323). Dr. Shah diagnosed sciatic

---

[7] This appears to be a specialist in physical medicine and rehabilitation, otherwise known as a physiatrist. About Physiatry, American Academy of Physical Medicine and Rehabilitation, https://www.aapmr.org/about-physiatry (last visited March 3, 2016).

[8] Effusion is the "accumulation of intra-articular fluid." Alexandra Villa-Forte, Pain in and Around a Single Joint, https://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/pain-in-and-around-joints/pain-in-and-around-a-single-joint (last visited March 3, 2016). "Erythema is a skin condition characterized by redness or rash." Erythema, University of Maryland Medical Center, http://umm.edu/health/medical/altmed/condition/erythema (last visited March 3, 2016).

neuralgia, a herniated disc in the lumbar spine, lumbar and sacral spondyloarthritis, and knee pain.  (R. at 323).  Treatment included physical therapy and medication for knee pain, including Nucynta.[9] (R. at 323).

A February 17, 2012, x-ray of the plaintiff's lumbosacral spine found "straightening of the normal lordotic curvature consistent with muscular spasm," mild scoliosis of the upper spine, mild degenerative disease and mild disc space narrowing at L5-S1, and mild degenerative changes at L2-L4.  (R. at 327).

Ms. Santiago visited Dr. Tokar again on April 3, 2012, complaining of knee and back pain, and was referred to a PMR.  (R. at 319).  On April 12, 2012, she was seen by Dr. Shah, whose assessment of her knee and back condition mirrored the February 16, 2012 evaluation.  (R. at 317).  Dr. Shah prescribed Tramadol[10] for back pain, and further prescribed a back brace and a psychiatric evaluation for depression.  (R. at 317).

On April 18, 2012, the plaintiff saw Ricarte Ligsay, a physical therapist.  (R. at 315).  Ms. Santiago complained of back pain (at an intensity of eight out of ten) that began when she fell down the stairs "years ago," and knee pain (at an intensity of seven out of ten), both of which were aggravated by prolonged sitting or standing.  (R. at 315).  She walked with a limping gait

---

[9]   Nucynta is an opioid pain medication.  Nucynta, http://www.drugs.com/search.php?searchterm=nucynta (last visited March 3, 2016).

[10]   Tramadol is a "narcotic-like pain reliever," Tramadol, www.drugs.com/tramadol.html (last visited March 3, 2016).

and reported that her affected muscles and joints impinged on her ability to care for her self and to participate in the community. (R. at 315). Mr. Ligsay assessed the strength of her knee flexors, knee extensors, and trunk extensors at two out of five, and the strength of her trunk flexors, trunk rotators, and trunk lateral flexors at two-plus out of five. (R. at 315). He found minimal swelling to the left knee area, and tenderness in the paralumbar area with severe spasm. (R. at 315). Mr. Ligsay assessed the plaintiff similarly on April 20 and April 24, 2012. (R. at 311-14).

A psychiatrist, Naveed Iqbal, M.D., assessed Ms. Santiago for the first time on April 21, 2012. (R. at 337). The plaintiff complained of depression, anxiety, and a history of bipolar disorder, describing symptoms of anhedonia, decreased energy, sleep disturbance, decreased motivation, irritability, racing thoughts, occasional hallucinations, and mild paranoia. (R. at 337-38). The plaintiff was well-groomed and cooperative, with coherent and age-appropriate language, and an intact thought process. (R. at 339-40). However, she had a constricted affect, depressed and anxious mood, and slowed psychomotor activity. (R. at 340). Dr. Iqbal also noted persecutory delusions and "on & off" auditory hallucinations. (R. at 340). Ms. Santiago was alert, had intact memory, judgment, insight, and impulse control, and was oriented to time, place, and person. (R. at 340). Dr. Iqbal assessed a GAF of

60.[11]  He noted mood lability and prescribed Seroquel.[12]  (R. at 341).  He increased the plaintiff's dosage approximately one month later, noting continued mood lability and racing thoughts.  (R. at 336).

        2.  <u>May 31, 2012 to January 24, 2014</u>

      On June 9, 2012, Dr. Iqbal again increased Ms. Santiago's Seroquel dosage to 200 milligrams, noting a labile mood.  (R. at 335).  His assessment of her functional capacities on June 19 indicated that she had a good (as opposed to unlimited/very good, fair, or poor or none) ability to follow work rules, use judgment, understand and carry out complex and simple instructions,  and maintain personal appearance; a fair ability to relate to co-workers, interact with supervisors, understand and carry out detailed but not complex instructions, relate predictably in social situations, and demonstrate reliability; and poor or no ability to deal with the public, deal with work stresses, function independently, maintain attention or concentration, and behave in

---

[11] The GAF is a psychiatric assessment tool that generates a numerical representation of a clinician's judgment as to a patient's overall functioning along a continuum of mental health. <u>See</u> American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2013).  The GAF was dropped from <u>DSM-5</u> "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." <u>Id.</u>  The GAF Scale provides scores from 1 ("[p]ersistent danger of severely hurting self or others") to 100 ("[s]uperior functioning in a wide range of activities").  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. text revision 2000) ("<u>DSM-IV</u>").  A GAF score between 51-60 indicates "[m]oderate symptoms . . . [or] moderate difficulty in social, occupational, or school functioning." <u>DSM-IV</u> at 34.

[12] Seroquel is an antipsychotic medication.  Seroquel, http://www.drugs.com/seroquel.html (last visited March 3, 2016).

7

an emotionally stable manner.  (R. at 342-43).  Ms. Santiago was coherent and oriented at a June 30 appointment, and her Seroquel prescription was continued at the same dosage.  (R. at 498).

Ms. Santiago also saw Dr. Tokar on June 19, 2012, seeking a referral for management of her back pain.  (R. at 464).  An examination revealed that she had normal spine curvature and sacroiliac joint mobility bilaterally, but severe paraspinal tenderness, bilaterally, in the lower lumbar region.  (R. at 464). She was again positive at forty-five degrees on a straight leg raising test.  (R. at 464).  At her pain management follow-up with Dr. Shah on August 9, the plaintiff described her lower back pain as "constant pressure, stabbing and pressure" radiating down both legs (although more severely on the right), with an intensity of seven out of ten.  (R. at 460).  The pain was aggravated by standing, sitting, and climbing steps, but alleviated by medication. (R. at 460).  Dr. Shah diagnosed sciatic neuralgia, a herniated lumbar disc, lumbar and sacral spondyloarthritis, and knee pain, and prescribed Tramadol, Flexeril,[13] Voltaren,[14] and a back brace.  (R. at 460).  The plaintiff was again referred for physical therapy and a psychiatric evaluation for depression.  (R. at 460).

On August 13, 2012, Ms. Santiago presented at Industrial Medicine Associates for a psychiatric consultative examination,

---

[13]  Flexeril is a muscle relaxant.  Flexeril, www.drugs.com/flexeril.html (last visited March 5, 2016).

[14]  Volataren is a "non-steroidal anti-inflammatory drug." Voltaren, www.drugs.com/voltaren.html (last visited March 5, 2016).

performed by Joyce R. Schreiber, Ed.D., and a consultative internal medicine examination, performed by Dipti Joshi, M.D. (R. at 345, 349). The plaintiff reported to Dr. Schreiber that she had trouble falling and staying asleep, and admitted to symptoms of depression -- including dysphoria, psychomotor retardation, crying spells, hopelessness, loss of interest, irritability, fatigue, diminished self-esteem, and problems with concentration -- as well as mania -- including anxiety, irritability, restlessness, difficulty concentrating, muscle tension, nightmares, excessive worry, and fear of closed places and crowds. (R. at 346). Treatment had improved her symptoms, although some still occurred. (R. at 346). She further reported that she could not clean, do laundry, or shop independently, but required help from her children. (R. at 347). She spent her days watching television, parenting her children, going to appointments, and "trying to do some light chores." (R. at 347). On examination, Dr. Schreiber found the plaintiff's appearance, speech, thought process, sensorium, orientation, and attention and concentration were generally normal, but remarked on Ms. Santiago's lethargic motor behavior and depressed mood. (R. at 346-47). Her memory skills, insight, and judgment were fair; her cognitive functioning was average or borderline. (R. at 347). Dr. Schneider opined that Ms. Santiago was capable of understanding, following, and remembering simple instructions; performing simple tasks independently; maintaining attention, concentration, and a schedule; making appropriate decisions; learning new tasks; and interacting appropriately with others. (R. at 347-48). Dr.

Schneider recognized that the plaintiff had some psychiatric problems, diagnosing her with bipolar disorder and generalized anxiety disorder, but attested that those disorders were not significant enough to interfere with her ability to function. (R. at 348).

To Dr. Joshi, Ms. Santiago reported a history of depression, knee pain at an intensity of eight out of ten, left foot pain, left hand pain following a fall, and low back pain radiating to her legs at an intensity of eight out of ten. (R. at 349). Although her gait was normal, the plaintiff had difficulty walking on her heels. (R. at 350). Her squat "was about 25%," she was obese, and she did not use an assistive device. (R. at 350). Ms. Santiago's cervical and thoracic spinal examinations were normal. (R. at 351). Lumbosacral spine flexion and extension were forty-five degrees, lateral flexion on the left was fifty degrees and on the right was ten degrees. (R. at 351). Straight leg raise testing was positive at forty-five degrees bilaterally. (R. at 351). The plaintiff had a "[r]ight paraspinal spasm with tenderness in her [lumrosacral] spine" with no redness, heat, or effusion. (R. at 351). The flexion and extension of her knees was 100 degrees (R. at 351), and an x-ray was normal (R. at 353). There was decreased sensation in the lower left extremity and increased sensation in the hips. (R. at 351). Bilateral hip flexion and extension strength were four out of five, while upper and lower extremities strength were five out of five. (R. at 351). Dr. Joshi diagnosed obesity, asthma, low back pain, lower extremity pain, intermittent pain in the left

10

fourth finger, left hand pain, and "unclear psychiatric issues."
(R. at 351).   He assessed marked limitations with squatting,
moderate limitations with bending, and opined that the plaintiff
should avoid dust, smoke, and fumes, as well as heavy lifting,
carrying, pushing, or pulling.  (R. at 352).

In a session with Mr. Ligsay on August 15, 2012, Ms. Santiago
complained of neck pain at an intensity of eight out of ten, and
lower back pain at an intensity of nine out of ten.  (R. at 457).
She had associated weakness, numbness, tenderness, and tightness,
as well as difficulty lifting, reaching, and walking, and limited
trunk and neck mobility.  (R. at 457).

On August 18, 2012, Dr. Iqbal noted the plaintiff had racing
thoughts and he increased her Seroquel dosage to 300 milligrams.
(R. at 497).

On September 4, 2012, state agency psychologist A. Hochberg
completed a psychiatric review technique assessment addressing
affective disorders and anxiety-related disorders.  (R. at 363).
He found that Ms. Santiago had bipolar disorder and generalized
anxiety disorder, but that neither precisely satisfied the criteria
in 20 C.F.R. Part 404, Subpt. P, App. 1 of the Social Security
regulations, known as "the Listings."  (R. at 366, 368).   Dr.
Hochberg found that the plaintiff had mild restriction in
activities of daily living and maintaining social functioning;
moderate difficulties in maintaining concentration, persistence, or
pace; and that she had not had repeated episodes of decompensation
of extended duration, a residual disease affecting her adjustment

11

such that a minimal increase in mental demands or environmental change would cause decompensation, or a history of one or more years' of inability to function outside a highly supportive living arrangement. (R. at 373-74). Dr. Hochberg also completed a Mental Residual Functional Capacity Assessment, finding moderate limitations in the following areas: ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance, and be punctual; ability to complete a normal work week without interruption from psychological symptoms and perform at a consistent pace without unreasonable rest breaks; ability to interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors; ability to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation, and to set realistic goals or made plans independently. (R. at 377-78). He opined that the plaintiff had the mental residual functional capacity for simple work. (R. at 379).

Ms. Santiago visited Dr. Shah on October 11, 2012, complaining of a sharp, shooting pain in her left hip that radiated down the leg. (R. at 453). She rated the intensity of the pain as seven out of ten. (R. at 453). The plaintiff had tender paraspinal muscles, straight leg raising was positive at thirty degrees, her motor system was limited due to pain, and her gait was antalgic and she used a cane. (R. at 453). Dr. Shah diagnosed radiculopathy

12

and prescribed a short course of Volteren, continued Tramadol, and physical therapy.  (R. at 453).  She further ordered an MRI of the spine and an x-ray of the left hip.  (R. at 453).

On January 29, 2013, Dr. Iqbal wrote a letter recommending that Ms. Santiago be "permanently excused from work because her symptoms [from major depression and bipolar disorder] will be severe if she is around people."  (R. at 427).  On March 15, 2013, he completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form, finding that the plaintiff had poor or no ability to make occupational adjustments such as following work rules, relating to co-workers, or dealing with work stresses, and asserting that work would make her symptoms more severe.  (R. at 390).  He further assessed her ability to make performance adjustments such as understanding and carrying out instructions as extremely limited, as was her ability to make personal social adjustments such as being reliable and emotional stable, although she had a fair ability to maintain personal appearance. (R. at 391).

On April 4, 2013, Dr. Tokar screened the plaintiff for depression.  (R. at 445).  The physician continued Ms. Santiago's asthma medication and referred her to a psychiatrist.  (R. at 445). On April 5, 2013, she was evaluated by the Federation Employment and Guidance Service, also known as FEGS or FEGS WeCare.[15]   She

---

[15] "FEGS WeCARE was a New York nonprofit organization that assisted public assistance applicants and recipients with clinical barriers to employment, including medical, mental health and substance abuse conditions, to obtain employment or federal disability benefits."  Henry v. Colvin, No. 12 Civ. 6822, 2015 WL

reported that she had left school in eighth or ninth grade, and denied having paid work since she was sixteen years old.  (R. at 399).  She cared for and supported three minor daughters who lived with her.  (R. at 396-97).  The plaintiff asserted that she had a history of domestic violence in her childhood and from her second husband.  (R. at 400).  She denied suicidal ideation, plan, or intent; denied auditory command hallucinations; but admitted to a seven-year history of panic attacks when in crowds, including crowds on public transportation.  (R. at 402-04).  She reported current and consistent symptoms of depression and sleep disturbance.  (R. at 403).  She was able to perform certain household chores, such as laundry, washing dishes, grocery shopping, cooking, and light cleaning.  (R. at 404).  Based on her medical history, including Dr. Iqbal's letter of January 29, 2013, the evaluator found that Ms. Santiago had substantial functional limitations to employment that made her unable to work.  (R. at 413).

A September 21, 2013 visit to Dr. Iqbal due to mood swings resulted in a prescription for Saphris.[16]  (R. at 493-95).  On October 11, the plaintiff complained of irritability and mood swings, and Dr. Iqbal continued her Saphris prescription.  (R. at 496).

On December 17, 2013, Dr. Iqbal filled out a Physician's

---

9238959, at *6 n.6 (S.D.N.Y. Dec. 17, 2015).

[16]  Saphris is an antipsychotic medication.  Saphris, http://www.drugs.com/saphris.html (last visited March 4, 2016).

Report for Claim of Disability due to Mental Impairment form.  (R.
at 507-14).  He noted that he had been seeing Ms. Santiago monthly
for seventeen months for symptoms of depressed mood, anhedonia,
decreased energy, sleep disturbance, decreased motivation,
irritability, racing thoughts, excessive energy, hallucinations,
and paranoia.  (R. at 507).  He found that she had manic syndrome
characterized by hyperactivity, pressures of speech, inflated self-
esteem, decreased need for sleep, easy distractibility, and
hallucinations, delusions, or paranoid thinking; depressive
syndrome characterized by anhedonia, appetite disturbance with
change in weight, sleep disturbance, decreased energy, difficulty
concentrating or thinking, and hallucinations, delusions or
paranoid thinking; bipolar syndrome characterized by periods of
"the full symptomatic picture of both manic and depressive
syndromes"; and anxiety-related disorders characterized by
persistent anxiety, motor tensions, apprehensive expectation, and
irrational fears, among other things.  (R. at 508, 511-12).  Upon
examination, she was well-groomed and cooperative, with coherent
and age-appropriate comprehension, but her affect was restricted
and her mood was depressed and anxious.  (R. at 509).  Dr. Iqbal
assigned a GAF of 65,[17] and noted that her mental conditions, which
required her to lie down for five hours a day, were expected to
last for at least one year.  (R. at 510).  He assessed her

---

[17] A GAF score of 61-70 indicates "[s]ome mild symptoms . . .
[or] some difficulty in social, occupational, or school functioning
. . . but generally functioning pretty well, [with] some meaningful
interpersonal relationships."  DSM-IV at 34.

functional restrictions as follows: marked restrictions of activities of daily living because she could not go out alone; marked difficulties in maintaining social functioning; and marked deficiencies of concentration. (R. at 513). Dr. Iqbal also reported repeated episodes of decompensation and an inability for the plaintiff to travel alone on a daily basis. (R. at 513-14).

      3.   <u>After January 24, 2014</u>

A February 12, 2014 MRI of the plaintiff's lumbrosacral spine found L5-S1 central subligamentous herniation and posterior annular tear, L3-L4 and L4-L5 disc bulges, and shallow dextrocurvature.[18] (R. at 24).

On March 26, 2014, Dr. Iqbal issued a letter substantially similar to his January 29, 2013 letter, asserting that Ms. Santiago could not work because her conditions "will be severe if she is around people." (R. at 25, 427). The March 26 letter adds that being around people causes her to have anxiety and panic attacks. (R. at 25). Dr. Iqbal issued a letter substantively identical to the March 26 letter on September 23, 2014. (R. at 20).

An April 23, 2014 x-ray of Ms. Santiago's knees revealed a "mild-to-moderate degree of osteoarthritis . . . involving the medial and patellofemoral compartments bilaterally," but was otherwise unremarkable. (R. at 23).

An Entitlement Specialist working with FEGS, Natalie Acevedo, completed a function report after an initial appointment with Ms.

---

[18] Dextrocurvature is a curve to the right. Scoliosis Types, http://www.spine-health.com/conditions/scoliosis/scoliosis-types (last visited March 4, 2016).

Santiago.  (R. at 10).  Ms. Acevedo reported that the plaintiff could not sleep due to racing thoughts and arose unsteady due to her medication; had difficulty dressing and bathing herself; must be reminded to take her medication and to go to appointments; could not prepare her own meals or do household chores, instead relying on one of her daughters to complete these tasks; did not take care of any children or animals; and could not go out alone or manage money.  (R. at 10-14).  The plaintiff's conditions affected her ability to lift, bend, stand, walk, sit, climb stairs, remember things, and complete tasks.  (R. at 15).  Her attention span was limited to five minutes.  (R. at 15).  Ms. Santiago could follow spoken instructions only if they were repeated, and could not follow written instructions.  (R. at 15).  Ms. Acevedo concluded that the plaintiff's "lack of [residual functional capacity], age, education, work experience, and debilitating side effects of prescribed medication," as documented by Dr. Iqbal and Dr. Tokar, made her unable to "perform any past work or new work for at least 12 months."  (R. at 17).

### C.  Procedural History

As noted, Ms. Santiago filed her application for SSI on May 31, 2012.  The Social Security Administration denied the application (R. at 96-107), and the plaintiff requested a hearing before an ALJ (R. at 93-95).  She appeared with counsel and an interpreter at a hearing before ALJ Michael Friedman on December 18, 2013.  (R. at 70).

Ms. Santiago testified that she lived with her three children

in an apartment.  (R. at 72).  She was five feet, five inches tall
and weighed approximately 200 pounds, having gained approximately
twenty-five pounds in the past year.  (R. at 73).  She reported
pain in her lower back and legs that was alleviated somewhat with
medication and by lying down, pain in her left hand, asthma, and
bipolar disorder that was occasionally alleviated by medication.
(R. at 73-75).  The plaintiff testified that she could stand for
approximately twenty minutes, sit for thirty to sixty minutes, walk
for one-half of a block, and lift two pounds.  (R. at 75).  She
could grocery shop with accompaniment, cook, and occasionally
clean.  (R. at 76).  She had difficulty sleeping, concentrating,
and completing tasks.  (R. at 76-78).  Being around other people
caused her panic attacks such that she rarely left her apartment.
(R. at 77-78).

Approximately five weeks later, on January 24, 2014, ALJ
Friedman issued a decision finding that the plaintiff was not
disabled within the meaning of the Social Security Act during the
period beginning May 31, 2012.  (R. at 45).  On April 1, 2015, the
Appeals Council affirmed the ALJ's decision, noting that the
additional evidence post-dating the ALJ's decision "did not affect
the decision about whether [the plaintiff] was disabled" because
the "new information [was] about a later time."  (R. at 1-2).

Analytical Framework

A. Determination of Disability

A claimant is disabled under the Social Security Act and
therefore entitled to disability benefits if she can demonstrate,

18

through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015). The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4), (b). Second, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(a)(4)(ii), (c). Third, if the impairment is included in the Listings or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d). Fourth, if the claimant is unable to make the requisite showing under step three, she must prove that she does not have the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. § 416.920(a)(4)(iv),

(e).  Fifth, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. §§ 416.920(a)(4)(v), (g), 416.960(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

    B. Judicial Review

    Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

    The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court reviewing the Commissioner's decision "may set aside a decision of the

20

Commissioner if it is based on legal error or if it is not supported by substantial evidence." Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), and Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Analysis

    A.   The ALJ's Decision

ALJ Friedman analyzed the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that she was not disabled on or after the date she filed her application for benefits. (R. at 45-56). He first determined that Ms. Santiago had not engaged in substantial gainful activity since the date she filed her application. (R. at 47). Next, at step two, he found that Ms. Santiago had severe impairments -- specifically obesity, degenerative disc disease of the lumbosacral spine, pain in the left knee and left foot, bipolar disorder, and asthma[19] -- that sufficiently limited her ability to perform basic work activities. (R. at 47).

At step three, ALJ Friedman found that none of the plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the impairments identified in the Listings. (R. at 47-49). More specifically, ALJ Friedman found that Ms. Santiago's impairments did not meet the criteria for four listed impairments: (1) major dysfunction of joints (listing 1.02); (2) disorders of the spine (listing 1.04); (3) asthma (listing 3.03); or (4) affective disorders (listing 12.04). As to the first three conditions, he found no inability to ambulate effectively; no nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudation; and no evidence of chronic asthmatic

_____

[19] The ALJ does not list asthma in his step two analysis, but he addresses it as an impairment in his step three and step four analysis. (R. at 47, 53).

bronchitis with attacks requiring physical intervention.  (R. at
47).  To satisfy the requirements for an affective disorder, the
claimant must meet the criteria of both paragraphs A and B of the
listing or meet the criteria of paragraph C.  20 C.F.R. Part 404,
Subpt. P., App. 1, Listing 12.04.  The ALJ appears to have found
that the plaintiff had the requisite symptoms to satisfy the
"paragraph A" criteria, which deal with symptoms of mania and/or
depression, but that she did not have at least two of the
"paragraph B" criteria: marked restrictions of activities of daily
living; marked difficulties in maintaining social functioning;
marked difficulties in maintaining concentration, persistence, or
pace; or repeated episodes of decompensation, each of extended
duration.  He found, rather, that she had mild restrictions in
activities of daily living, as she took public transportation and
could perform self-care and some cleaning.  (R. at 48).  She had
moderate difficulties in social functioning; and moderate
difficulties in concentration, and pace, as confirmed by a
consultative examination that found intact concentration but fair
memory, as well as the fact that Dr. Iqbal sometimes found her
memory intact but other times did not.  (R. at 48).  Finally, he
found no evidence of episodes of decompensation in the medical
records other than a statement by Dr. Iqbal.  (R. at 48).  The ALJ
found no medical evidence of "Paragraph C" criteria.  (R. at 48-
49).

     At step four, ALJ Friedman found that, although Ms. Santiago
could not perform any of her past relevant work, she had the

residual functional capacity to perform light work, except she could not be exposed to excessive pulmonary irritants and was limited to jobs involving simple, routine, repetitive tasks requiring only occasional contact with others. (R. at 49, 54). He reasoned that the plaintiff's medically-determinable impairments could be expected to cause her alleged symptoms, but that her statements about the intensity, persistence, and limiting effects of those symptoms were not credible. (R. at 53). As to her physical ailments, ALJ Friedman noted that the medical records confirm spinal problems, but that both her MRI and her doctors' treatment regimen indicate that her degenerative disc disease is mild. (R. at 53). For example, he notes that "doctors have recommended only conservative treatment such as physical therapy and non-narcotic pain medication. No physician has suggested surgery, pain injections, or even prescribed assistive devices for ambulation." (R. at 53). X-rays show her foot pain is caused by "minor swelling and calcaneal spurs, a relatively minor condition." (R. at 53). While examinations revealed tenderness and limited range of motion in her knees, "x-rays were negative." (R. at 53). Finally, she denied any emergency room visits, hospitalizations, or intubations due to asthma. (R. at 53).

Regarding the plaintiff's mental condition, the ALJ gave little weight to the opinion of treating physician Dr. Iqbal, noting that his progress notes show no observed evidence of psychotic symptoms or mania; rather these symptoms appear to be based on Ms. Santiago's own reports. (R. at 54). ALJ Friedman

24

characterized Dr. Iqbal's finding that the plaintiff was markedly
limited in all functional areas as "not only not believable and not
supported by his own examination findings, but contradicted by [Ms.
Santiago] herself, her lack of hospitalizations, and her ability to
engage in most activities of daily living." (R. at 54).   He
further commented on the internal inconsistency of Dr. Iqbal's
records, such as his assessment of a GAF of 65 even while finding
the plaintiff markedly impaired in all areas. (R. at 54).   The ALJ
gave significant weight to the findings of consultative examiner
Dr. Schreiber, which were supported by examination findings, and
"somewhat less weight" to Dr. Hochbergh's opinions because he did
not directly observe Ms. Santiago, but based his opinions on the
findings of Dr. Iqbal and Dr. Schreiber. (R. at 54).

At step five, the ALJ noted the plaintiff's age (46 years old
on the date the application was filed, which categorizes her as a
younger individual under the regulations, see 20 C.F.R. § 416.963,
and found that she could not communicate in English (R. at 54). He
found that transferability of job skills is irrelevant to the
determination of disability. (R. at 55). Finally, considering her
age, education, work experience, and residual functional capacity,
he found that jobs exist in significant numbers in the national
economy that Ms. Santiago could perform, and therefore, she is not
disabled. (R. at 54).

B.   Substantial Evidence

Substantial evidence supports the ALJ's determination that Ms.
Santiago is not disabled.

25

At step three, ALJ Friedman carefully applied the requirements of the relevant listings to the medical evidence and correctly found that Ms. Santiago's impairments do not meet or equal the severity of a listed impairment.  To be sure, the ALJ did not explicitly address whether a combination of her impairments meets the severity of a listing, but it is clear that he considered all of Ms. Santiago's impairments through examination of her medical records.  (R. at 47-55).  Indeed, he notes three times that the analysis requires a determination of whether a combination of impairments meets the criteria of a listing.  (R. at 46-47). "[T]he fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered, particularly in view of the fact that the ALJ referred to 'a combination of impairments' in [his analysis]." Seekins v. Astrue, No. 3:11-CV-264, 2012 WL 4471266, at *7 (D. Conn. Aug. 14, 2012) (alterations in original) (quoting DeJesus v. Astrue, No. 3:10-CV-705, 2011 WL 2076447, at *3 (D. Conn. May 26, 2011), report and recommendation adopted, 2012 WL 4471264 (D. Conn. Sept. 27, 2012); see also Laquerre v. Commissioner of Social Security, No. 13 Civ. 6747, 2014 WL 7373435, at *11 (S.D.N.Y. Dec. 29, 2014).  Moreover, the plaintiff does not appear to object to the ALJ's step three analysis, but focuses on his reasoning at step four.  (Pl. Memo. at 21-24).

The plaintiff complains that the ALJ "mischaracterizes the evidence and consequently failed to address evidence favorable to Ms. Santiago's claim of disability." (Pl. Memo. at 21).  As noted,

26

a court must uphold an ALJ's factual findings if they are supported by substantial evidence, that is, evidence that "a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Perales, 402 U.S. at 401). If the record provides that quantum of evidence in support of the ALJ's decision, "[the] decision must be upheld, even if substantial evidence supporting the [plaintiff's] position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008).

ALJ Friedman noted that the medical records confirm spinal problems, but that a February 2012 MRI showed only mild degenerative disc disease. (R. at 53, 291). An x-ray that same month similarly revealed minor degenerative changes. (R. at 327). And, as the ALJ noted, Ms. Santiago's treating physicians recommended relatively conservative treatment, such as physical therapy and oral medication. (R. at 53). It is true that the ALJ was mistaken when he stated that no narcotic pain medication was prescribed. (R. at 53, 137, 323; Pl. Memo. at 22). However, his observation that the physicians failed to prescribe more invasive measures, such as pain injections or surgery (R. at 53), remains accurate. And, although there is evidence that Ms. Santiago used a cane, there is no indication that such any of her doctors ever prescribed such an ambulatory aid. See Social Security Ruling 96-9P, 1996 WL 374185, at *7 (SSA July 2, 1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the

27

circumstances for which it is needed . . . ."); see also Dahl v. Commissioner of Social Security, No. 5:12 CV 302, 2013 WL 5493677, at *5 (N.D.N.Y. Oct. 1, 2013) ("The burden to establish such medical necessity rests with a claimant."). X-rays taken in connection with the plaintiff's complaints of hand, foot, and knee pain were all negative. (R. at 303, 351, 353-54). And there is no evidence that her asthma is anything but mild; for example, she reported that she had never been hospitalized in connection with respiratory issues. (R. at 345).

Regarding Ms. Santiago's mental condition, ALJ Friedman relied primarily on the opinion of examining (but not treating) physician Dr. Schreiber. She found that the plaintiff had only mild limitations. (347-48). This opinions is supported by other record evidence. For example, on June 19, 2012, Dr. Iqbal rated her good or fair in most functional capabilities, noting significant restrictions only in a few areas. (R. at 342-43). The ALJ's opinion is also bolstered by Dr. Hochberg's opinion (R. at 363-79), which the ALJ properly considered but afforded "somewhat less weight" because the doctor did not directly observe or examine the plaintiff (R. at 54).[20]

---

[20] The plaintiff argues that Dr. Hochberg's opinion must be discounted completely because he reviewed a prior denial of benefits from August 2009. (Pl. Memo. at 23-24; R. at 379). This denial is not a part of the record evidence in this case. However, Dr. Hochberg's opinion does not appear to rely on such extra-record evidence. Rather, it rehearses the relevant medical evidence that is part of the record in reaching its ultimate opinion. Moreover, nothing indicates that ALJ Friedman relied on any extra-record evidence in making his determination. This is not, then, a reason to vacate the Commissioner's opinion and remand the case.

The ALJ gave little weight to Dr. Iqbal's later opinions that found that Ms. Santiago had marked restrictions in nearly all functional areas. (R. at 53). The regulations establish that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)); accord Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010). "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927(d)(2)). The ALJ is not required to give the treating source's opinion controlling weight, but he is required to give "good reasons" for the weight he does assign to the opinion. 20 C.F.R. § 404.1527(c)(2); see Snell, 177 F.3d at 134 ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases . . . . [A claimant] is entitled to be told why the Commissioner has decided -- as under appropriate circumstances is his right -- to disagree with [the treating physician]."). If the ALJ determines that a treating

29

physician's opinion is not controlling, he is required to consider the following factors in determining the weight to be given to that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the relationship; (3) the evidence provided to support the physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.   20 C.F.R. § 404.1527(c); see Halloran, 362 F.3d at 32.   Although the ALJ need not explicitly discuss the factors, the decision must clearly demonstrate that he properly applied the required analysis.   Khan, 2013 WL 3938242, at *15 (citing Petrie, 412 F. App'x at 406).

Here, the ALJ discussed Dr. Iqbal's treatment relationship with Ms. Santiago, noting its duration and reviewing the doctor's records.   (R. at 51-54).   He ultimately discounted Dr. Iqbal's later opinions that the plaintiff had significant functional limitations because those opinions were both inconsistent with other medical records and internally inconsistent.   (R. at 54). Indeed, ALJ Friedman pointed out that Dr. Iqbal's December 17, 2013 report found marked limitations in all areas of functioning, but assessed a GAF score of 65, which indicates only mild symptoms. (R. at 52, 54).   It was not error for the ALJ to fail to give these opinions controlling weight, and he has provided "good reasons" for doing so.   20 C.F.R. § 404.1527(c)(2).

C.  Post-Decision Medical Evidence

The plaintiff provided the Appeals Council with additional medical records not before the ALJ.  A claimant is expressly authorized to submit new evidence to the Appeals Council, without any requirement to demonstrate good cause.  20 C.F.R. § 416.1470(b); see also Shrack v. Astrue, 608 F. Supp. 2d 297, 302 (D. Conn. 2009); Garcia v. Commissioner of Social Security, 496 F. Supp. 2d 235, 242 (E.D.N.Y. 2007) (quoting Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996)).  Where the new evidence is material and relates to the period on or before the date of the disability determination, the Appeals Council must consider the evidence.  20 C.F.R. § 404.970(b); see Perez, 77 F.3d at 45; Brown v. Commissioner of Social Security, 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010).  If the Appeals Council fails to do so, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence."  Shrack, 608 F. Supp. 2d at 302.  In order to be considered, such evidence must be both new, meaning noncumulative of evidence in the existing record, and material, meaning relevant to and probative of the claimant's condition during the time period at issue.  Lisa v. Secretary of Health & Human Services, 940 F.2d 40, 43 (2d Cir. 1991); accord Sergenton v. Barnhart, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007).  In short, there must be a "reasonable possibility that the new evidence would have influenced the [ALJ] to decide [a] claimant's application differently."  Lisa, 940 F.2d at 43.

The plaintiff argues that two particular medical records --

31

the report regarding the February 12, 2014 MRI of Ms. Santiago's lumbar spine (R. at 24) and the report regarding the April 23, 2014 x-ray of her knees (R. at 23) -- should have been considered by the Appeals Council (Pl. Memo. at 19-21).   The Appeals Council discounted these records, stating that the new information was irrelevant because it dealt with a time after the date of the ALJ's decision, January 24, 2014.   (R. at 2).

The mere fact that evidence post-dates and does not refer explicitly to the relevant time period is not sufficient to exclude it.   See Pollard v. Halter, 377 F.3d 183, 193-94 (2d Cir. 2004). So, for example, in Williams v. Commissioner of Social Security, 236 F. App'x 641 (2d Cir. 2007), the Second Circuit ordered the case remanded the Commissioner to consider a May 2004 myelogram that post-dated the ALJ's decision by approximately eleven months.[21] Id. at 644.   The court found that the report "provide[d] objective evidence" of the claimant's condition and "appear[ed] to be both probative and material," especially in light of the fact that the ALJ had found insufficient evidence to support the claimant's complaints of debilitating pain and had indicated the utility of a myelogram.   Id.   In Melvin v. Barnhart, No. 02 Civ. 4527, 2004 WL 2591948 (S.D.N.Y. Nov. 8, 2004), the court remanded the case for consideration of a new physical assessment report post-dating the ALJ's decision by two years and showing more severe limitations than prior assessments had shown.   Id. at *6-7; see also Baran v.

---

[21] The ALJ issued his opinion in June 2003.   See Brief for the Defendant-Appellee, No. 06-2109, 2006 WL 5000884, at *3 (2d Cir. Nov. 30, 2006).

Bowen, 710 F. Supp 53, 56 (S.D.N.Y. 1989) ("Moreover, [the new medical reports] are material, for they document the severity of [the plaintiff's] impairments and are closely linked to her impairments during the pertinent period of disability, and demonstrate that [her] impairment has worsened . . . .").

Here, Ms. Santiago has presented two objective medical reports that indicate her condition is more severe that the ALJ originally assessed.  The February 12, 2014 MRI, taken mere weeks after the ALJ's decision, indicates a herniation at L5-S1.  (R. at 24).  In his decision, the ALJ specifically noted that the record lacked test or examination results to support Dr. Shah's diagnosis of lumbar disc herniation. (R. at 50).  Similarly, the April 23, 2014 knee x-ray found evidence of osteoarthritis, which was not clear from prior medical evidence (R. at 23), a fact that the ALJ also noted in his decision (R. at 53).  Particularly in light of the ALJ's finding that Ms. Santiago's claims regarding the intensity, persistence, and limiting effects of those symptoms were not credible because unsubstantiated by medical evidence (R. at 53), this new evidence, which shows increased severity of both Ms. Santiago's spine and knee problems, might reasonably influence the ALJ's credibility determination so that, for example, he credited Ms. Santiago's statement that she could lift approximately two pounds and neither stand nor sit for long periods of time. (R. at 75).  That, in turn, would bear on ALJ FRiedman's assessment that the plaintiff has the residual functional capacity to perform light work, which requires "lifting no more than 20 pounds at a time with

33

frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. § 416.967 (a), and, indeed, might restrict her even from sedentary work, 20 C.F.R. § 416.967(b).  This new evidence is therefore material, and should be considered upon remand.[22]  <u>See, e.g.</u>, <u>Williams</u>, 236 F. App'x at 644 ("Although the ALJ's determination was supported by substantial evidence, the proceeding is remanded for consideration of new evidence.")

<u>Conclusion</u>

For the foregoing reasons, I recommend denying the Commissioner's motion for judgment on the pleadings, granting the plaintiff's cross-motion for judgment on the pleadings, vacating the Commissioner's decision, and remanding the case for consideration of new evidence pursuant to sentence four of 42 U.S.C. § 405(g).

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have

---

[22] The Commissioner appears to argue that post-decision medical records are material only if they (1) supply evidence that the ALJ "specifically found lacking," or (2) demonstrate "substantially different" physical limitations than originally assessed.  (Def. Memo. at 4 n.2).  However, the standard is not so strict.  Evidence is material if there is a "reasonable possibility that . . . [it] would have influenced the [ALJ] to decide [a] claimant's application differently." <u>Lisa</u>, 940 F.2d at 43 (quoting <u>Tirado v. Bowen</u>, 842 F.2d 595, 597 (2d Cir. 1988)).

The remaining evidence that was presented first to the Appeals Council is not probative, however.  Dr. Iqbal's letters are merely cumulative of his earlier opinions.  (R. at 20, 25, 427).  Ms. Acevedo's report is not based on objective medical tests, and she explicitly disavows knowledge of when the extreme limitations she observed began.  (R. at 14).  I therefore do not find that this report sheds sufficient light on Ms. Santiago's condition during the relevant time period.

fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, Room 1310, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         March 16, 2016

Copies transmitted this date to:

Richard P. Morris, Esq.
Klein, Wagner & Morris, L.L.P.
227 Broadway
9th Floor
New York, NY 10007

Christopher J. Bowes, Esq.
54 Cobblestone Drive
Shoreham, New York 11786

Christine S. Poscablo, Esq.
Assistant U.S. Attorney
86 Chambers Street
New York, NY 10007